Argued January 27, reversed and remanded with instructions
October 9, petition for rehearing denied November 21, 1972

MEYER et ux, *Respondents, v.*
HARVEY ALUMINUM et al,
*Appellants.*

501 P2d 795

*Fredric A. Yerke* and *Douglas M. Ragen,* Portland, argued the cause for appellants.

*Arden E. Shenker* and *Lamar Tooze, Jr.,* Portland, argued the cause for respondents.

Before O'CONNELL, Chief Justice, and MCALLISTER, DENECKE, HOLMAN,[*] HOWELL, BRYSON and LANGTRY, Justices.

DENECKE, J.

Plaintiffs obtained a judgment in the sum of approximately one-half million dollars for injuries to their fruit crops and trees caused by emissions from defendants' aluminum plant. Defendants appeal.

I

*Qualifications of Opinion Witness*

Plaintiffs recovered damages for the excessive number of apricot culls, apparently, only for the year

---

[*] Holman, J., did not participate in this decision.

1965. The only evidence that an excessive number of culls was caused by fluorides emitted from defendants' plant is the opinion testimony of plaintiff Wilson Meyer. Defendants objected to his testimony upon the ground that he was not qualified as an expert to give such opinion testimony of causation. The trial court admitted the testimony and defendants assign its ruling as error.

The evidence is not clear; however, the excessive number of culls apparently was caused by the apricots becoming "freckled" after they were picked and delivered to the marketing organization. The witness simply stated that the "freckling" was caused by the fluorides. He did not say how that came about or the basis for his opinion. The trial court permitted him to testify because "he is the property owner and has farmed the thing."

Upon cross-examination the witness admitted that on fluoride damage, "I don't consider myself a real authority, no." He stated, however: "I do feel that I am an authority on whether it's frost and the other natural elements."

■ The determination of a witness's qualifications as an expert is entrusted to the trial court's judgment; however, that judgment is not uncontrolled. We can review the evidence to decide whether the trial court's determination is supported by evidence. *State Highway Com. v. Arnold,* 218 Or 43, 60, 341 P2d 1089, 343 P2d 1113 (1959).

As Wigmore states, "The capacity [to testify] is *in every case a relative one, i.e.,* relative *to the topic about which the person is asked to make his statement."* 2 Wigmore, Evidence (3d ed), 634, § 555.

■ Ownership of real property alone is not sufficient. Merely holding title or possession of real property does not endow one with expertise on injury to such property caused by fluorides. Likewise, the farming of land does not necessarily impart knowledge of the effects of fluorides upon the land. Continued observations arising from farming and possession may be a source of expertise from which a competent opinion could be formulated. There is no evidence, however, that the witness had made any observations from his land ownership and farming which would lend credence to his opinion that fluorides caused the damage.

*National Zinc Co. v. Crow,* 187 Okla 513, 103 P2d 560 (1940), presented a similar problem. The plaintiff raised fine blooded horses. A zinc smelter commenced operation near plaintiff's farm. Plaintiff's colts became afflicted with a serious malady. The plaintiff testified that the malady was caused by the smelter smoke. The court held the plaintiff was not qualified to testify solely because he had raised the colts.

*Bean v. Diamond Alkali Company,* 93 Idaho 32, 454 P2d 69 (1969), contains opinions supporting both the view that the farmer is qualified and that he is not qualified. Plaintiff brought an action contending that a chemical herbicide sold to him by the defendant caused damage to his onion crop. The plaintiff and other nearby farmers testified that upon the basis of their growing onions and being familiar with the diseases which afflict onions they were of the opinion that the damage was caused by the chemicals in the herbicide. The dissent stated that while the farmer witnesses had the experience to testify about damage which disease inflicts upon onions, they had no more

knowledge of the effects of herbicides than did the jury; therefore, they were not qualified to testify.

In the instant case, according to the testimony, the effect of fluorides upon various crops is a perplexing subject. The witness did not recite any basis for his opinion except that it can be inferred that he reasoned that the freckling started after the plant began operation and, therefore, the defendants' plant was responsible. This, however, is insufficient to qualify him as an expert.

For these reasons the trial court erred in admitting Wilson Meyer's testimony. With this testimony excluded there is no evidence to support the award of damages for the excessive number of apricot culls and damages cannot be awarded for this claim.

## II

### Evidence of Loss of Income

■ Defendants contend that the court erred in submitting some but not all of the claims for damages to apricots and peaches to the jury upon the ground that there was no competent evidence to support the claims. Defendants contend the only evidence of the amount of damages was the loss of gross income and there was no evidence of the net loss. The plaintiffs contend defendants did not object adequately so as to preserve this error for consideration on appeal. We are of the opinion that proper objections were made.

The parties are in agreement that the proper measure of damage is as set out in *Cross v. Harris*, 230 Or 398, 406, 370 P2d 703 (1962):

"The measure of damages in a case of injury to growing crops is the difference between the value of the crop immediately before and immediately

after the injury, to be ascertained by taking the value at maturity which the crop would have had but for the injury and deducting the value which the injured crop actually had at maturity and deducting, further, any reduction in amount and value of labor and expense attributable to the reduced yield. * * *"

The crop damage arising from the loss of peach trees in 1962 is illustrative of the problem. Plaintiffs presented evidence that 483 peach trees had to be removed in 1962 because of fume damage. The plaintiff Mrs. Meyer was the principal witness on the computation of damages. She testified that in 1962 they had to remove 483 trees at a crop loss that year of $4,830. New trees will not yield for the first three years; so the loss of trees in 1962 meant the loss of a crop for three more years. Therefore, the loss for 1962 was multiplied by three for a loss of $14,490. In its special verdict the jury awarded plaintiffs as "prospective peach profits to 1966," $19,320, that is, $4,830 plus $14,490.

Mrs. Meyer testified she determined the crop loss for each year by multiplying $10 by the number of trees which had to be removed, 483 in 1962. She stated, "We figured that at $10 a tree, figuring the crop loss for that year for that tree, $10 would be a very conservative estimate of the income producing ability of that tree, which would be about a hundred pounds at 10 cents a pound per tree."

Plaintiffs contend this 10 cent figure was intended to state the net income from a pound of peaches with all expenses deducted. Viewed in the context of Mrs. Meyer's entire testimony, a jury could not reasonably find that the price of 10 cents per pound was the net income derived from the sale of peaches.

She referred to that 10 cents per pound in testifying how she determined the amount of the loss caused by an excessive number of culls because of fume damage:

"A    That is the excess cullage times the number 1 price we received that year [1962] from Stadelmans [a marketing organization], which are not exactly that, I couldn't say that, but what we felt was a number 1 price which was 10 cents a pound. We established that 10 cents a pound was a fair price for number 1 peaches.

"* * * * *

"Q    * * * In 1962 did you know what the price for peaches was?

"A    This, of course, was based upon my husband's experience in selling peaches previous to this."

In other parts of her testimony it is evident that, when Mrs. Meyer referred to a price for fruit, she was referring to the price received from Stadelman, which was a gross income price with no expense deductions for harvesting the fruit. The same was true of her testimony on apricots.

There is no testimony whatsoever of plaintiffs' expenses incurred in raising and harvesting fruit. We do not know all of the kinds of expenses that must be incurred; however, we do know that picking alone is a substantial expense.

It was error to submit the items of damage specified in this assignment of error, numbered 7, to the jury and no damages can be awarded for these items. *Douglas Const. v. Mazama Timber,* 256 Or 107, 471 P2d 768 (1970).

## III

### Evidence Concerning the Computation of Damages

■ A witness called by the plaintiffs testified he adjusted claims for many years for crop damage caused by emissions from an American Smelter and Refining Co. plant in Utah. The principal effluent emitted by this plant was sulfur dioxide. The principal damage was to alfalfa, with perhaps some to cherry and peach orchards. The witness was permitted to testify over objection that in adjusting claims he paid one and one-half times "the actual loss." The witness did not explain why he paid one and one-half times the loss. Plaintiffs' counsel argued that this was because of "hidden damage" which the witness could not ascertain. The witness did not so testify.

We find the testimony clearly irrelevant and its admission was error.

■ The plaintiffs asked an economist the "present value" of the various years' losses claimed by plaintiffs. Over objection, the economist was permitted to testify that present value is determined by taking the amount of the loss, multiplying it by the interest rate (he used 6 per cent) for the number of years between the date of loss and the present (1970 in this case). For example, plaintiffs contended they lost $14,449.56 in 1960 because of fluoride damage to their cherries. The witness calculated the "present value" of such loss to be $25,865. The witness made the same calculations for all the claimed losses and an exhibit was introduced showing these present values.

Plaintiffs assert the evidence is relevant on several grounds. Contrary to plaintiffs' contention, we find that the evidence is only relevant to inform the

jury of the interest rate and the amount of any award for the 1960 loss should be enhanced in order to reflect accrued interest from the date of loss. This we have held is not relevant because interest is not allowable on unliquidated damages. *Calcagno v. Holcomb,* supra (181 Or 603); *Emrich v. Emery,* 216 Or 88, 100, 332 P2d 1045, 335 P2d 604, 337 P2d 972 (1959).

We have no way of knowing whether this erroneously admitted evidence of the "present value" of plaintiffs' past losses and testimony of the method of adjusting extraneous alfalfa claims for one and one-half times actual value affected the size of the verdict. Ordinarily, erroneously admitted evidence is deemed prejudicial unless the contrary is affirmatively shown. *Kirkendall v. Korseberg,* 247 Or 75, 77-78, 427 P2d 418 (1967). The contrary is not shown here; therefore, we find this erroneously admitted evidence was prejudicial upon all issues concerning the amount of damages.

## IV

### Treble Damages

One of the principal contentions of the defendants is that the trial court erred in tripling the amount of the actual damages assessed by the jury.

The trial court acted pursuant to ORS 105.810,[⊙] which provides, in part: "* * * [W]henever any per-

---

[⊙] ORS 105.810: "Except as provided in ORS 477.090, whenever any person, without lawful authority, wilfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person, or of the state, county, United States or any public corporation, or on the street or highway in front of any person's house, or in any village, town or city

son * * * wilfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person * * * if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed * * *."

A companion statute which aids in interpreting ORS 105.810 is ORS 105.815, which provides:

"If, upon the trial of an action included in ORS 105.810, it appears that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, or that the tree or timber was taken from uninclosed woodland for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall be given for double damages."

■ The issue is whether these statutes apply to injuries to plaintiffs' fruit crops and trees caused by fumes emitted from defendants' plant.

These statutes have been part of Oregon law since Deady's codification. Deady, General Laws of Oregon 1845-1872 (Civ Code), §§ 335, 336, p 80. For our purposes the most significant amendment added the

lot, or cultivated grounds, or on the common or public grounds of any village, town or city, or on the street or highway in front thereof, in any action by such person, village, town, city, the United States, state, county or public corporation, against the person committing such trespass if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass. In any such action, upon plaintiff's proof of his ownership of the premises and the commission by the defendant of any of the acts mentioned in this section, it is prima facie evidence that the acts were committed by the defendant wilfully, intentionally and without plaintiff's consent."

phrase: "Sec. 346. *Trespass for Cutting Trees—Treble Damages.* Whenever any person shall *wilfully injure or sever from the land of another any produce thereof,* or shall cut down, girdle * * *." (Amendment emphasized.) Oregon Laws 1925, ch 14, p 24.

The amendment of 1925, adding "produce" seems to indicate that the statute was not to be limited to the injuring of trees. The use of "injury" as well as "cut" or "sever," etc., seems to indicate that the statute applies although the damage is inflicted in ways other than cutting.

Our decisions construing these statutes have always involved the cutting of timber. The two exceptions are *Cross v. Harris,* 230 Or 398, 370 P2d 703 (1962), and *Brown v. Johnston,* 258 Or 284, 482 P2d 712 (1971). The former concerned barley damaged by a negligent crop duster. The applicability of the statute was not questioned on appeal. In *Brown v. Johnston,* supra (258 Or 284), the jury found the plaintiff's tree was killed by an intentional application of a herbicide into the root system where it extended onto the defendant's property. We refused to decide defendant's contention that the triple damage statute did not apply because the defendant had not objected in the trial court to the trebling of the actual damages.

In one of the early fume cases in Oregon seeking damages for the destruction of crops and trees, United States District Judge James Alger Fee, held: "There is, however, no basis for the allowance of treble damages under the Oregon statute, since the language shows the enactment covers only deliberate trespass such as involved in cutting standing timber." *Kerr v. Reynolds Metal Company* (December 11, 1955, US Dist Ct D Or unreported).

One purpose of the treble damage statute is to deter the cutting of another person's timber. *Kinzua Lbr. Co. v. Daggett*, 203 Or 585, 591-592, 281 P2d 221 (1955). The destruction of fruit and fruit trees by fumes might also be deterred by the assessment of treble damages.

Another purpose of the multiple damage statutes is applicable to timber trespass but not to injury of fruit and fruit trees. If a trespasser who cuts another's timber is required only to pay as damages the value of the timber felled, the trespasser, in effect, would have forced the timber owner to sell his timber at market value. Such a practice obviously would be advantageous to a trespasser who needed timber and unfair to a timber owner who did not want to sell. "To offset this unfairness several states have rules calling for double, treble, and even quadruple damages in the event of trespass to timber." Falk, Timber and Forest Products Law, 108 (1958).

Some of the distinctions that the multiple damages statutes make between the circumstances when treble damages may be assessed and when only double damages can be assessed cannot be made applicable to the instant case. Treble damages cannot be assessed if "the defendant had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, or that the tree or timber was taken from uninclosed woodland for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall be given for double damages." ORS 105.815.

Based upon the litigation history of this treble damage statute and the total scheme of the multiple

damage statutes, we conclude that they do not apply to the kind of damages assessed in the instant case.

Plaintiffs point out that the defendants did not object to the trebling of damages at any time during the trial, except to contend that the damage was not inflicted wilfully, and, therefore, there was no basis in the evidence to triple the damages. Defendants' counsel on appeal, who were not counsel at trial, in effect, admit that the issue was not raised at trial; however, we decide the issue because we are remanding the case for a new trial and this issue undoubtedly will be raised in the new trial.

The judgment is reversed and the cause remanded for a new trial upon the claims for injuries to cherries and those claims for injuries to peaches and apricots not barred by parts I and II of this opinion. As to the barred claims, we have held herein there was no evidence to support these claims.